UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LAURA S. MCCOOK                          CIVIL ACTION

VERSUS                                   No.: 17-7835

UNUM LIFE INSURANCE                      SECTION: "J" (4)
COMPANY OF AMERICA

## ORDER & REASONS

Before the Court are *Cross-Motions for Judgment as a Matter of Law* ("JMOL")
filed by Plaintiff, Laura McCook, **(Rec. Doc. 19)** and by Defendant Unum Life
Insurance Company of America ("Unum") **(Rec. Doc. 21)**.  Both Plaintiff (Rec. Doc.
23) and Defendant (Rec. Doc. 24) have filed an opposition, and Plaintiff has filed a
reply to her JMOL (Rec. Doc. 29). Having conffsidered the motions and legal
memoranda, the record, and the applicable law, the Court finds that Plaintiff's motion
should be **DENIED**, and Unum's **GRANTED**.

## FACTS AND PROCEDURAL BACKGROUND

This litigation arises out of a decision to terminate benefits payments pursuant
to an employee health benefits plan (the "Plan") governed by the Employment
Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*. Plaintiff
alleges that her long term disability benefits were wrongfully terminated by Unum
pursuant to the Plan's 2-year cap on benefits for disabilities "due solely to mental
disorders."[1]

---

[1] AR 293.

Plaintiff worked as an account manager for Ubisoft, Inc. Her job was to sell video games to retailers and required little in the way of heavy lifting but frequent travel and interactions with people. A few months after moving into a new home in 2006, Plaintiff says she began experience a variety of maladies. Beginning in April of that year she suffered her first migraine headache. Her symptoms quickly grew to include painful digestive cramps and vertigo.[2] She reports that black mold, Stachybotrys chartarum, was found in her home in July of 2013. Her home was remediated soon after the discovery, but her symptoms did not improve.

She stopped working for Ubisoft in March of 2014, claiming disability. She later reported that by that time she was "experiencing significant cognitive defects . . . and was unable to meet work demands due to dizziness,  confusion, and overall fatigue."[3] Her treating physician, Dr. William J. Rea of the Environmental Health Center, completed an Attending Physician's Statement—a part of Unum's short-term disability claim form—on March 28, 2014.[4] Dr. Rea wrote that Plaintiff was required to avoid "exposure of incitants including amient [sic] levels of petrochemicals, solvents, pesticides, fragrances, and molds." Dr. Rea's primary diagnosis was "Chronic Fatigue" with a secondary diagnosis of "Autonomic Nervous System Dysfunction."[5] His treatment plan was to prescribe "food & inhalant antigen therapy, IV therapy, Heat Depuration Therapy, Oxygen Therapy, Ambien 5 mg, Remeron 15 mg."[6] Dr. Rea listed Plaintiff expected date of return to work as June 23, 2014.

---

[2] AR 236-37.
[3] *See* Dr. Didrikson's Neuropsychological Consultation, AR 237.
[4] AR 74.
[5] AR 75.
[6] AR 75.

However, Plaintiff never returned to work. On June 9, 2014, she sent Unum a 24-page evaluation of her medical condition written by Dr. Nancy A. Didriksen, a health psychologist and expert in behavioral medicine. Dr. Didriksen conducted a battery of tests on Plaintiff and interviewed her extensively. Plaintiff reported to Dr. Didriksen that her primary symptoms at the time were dizziness, chronic pain and fatigue, sleep disturbances, and chemical and inhalant sensitivities following exposure to toxigenic molds in her home.[7] She also reported that her insomnia, which had developed in her 20s, worsened once she moved into her home. Dr. Didriksen wrote that fatigue and pain behaviors were evident and that there was no evidence of malingering.[8]

Dr. Didriksen indicated in her evaluation that Plaintiff was suffering severe anxiety and depression and that her "[d]efense mechanisms do not always appear adequate to [address] anxiety and depression associated with ill health, environmental sensitivities, inability to work, concomitant financial constraints, and an uncertain future."[9] Plaintiff's primary stressor was her fear of not regaining her health. IQ tests administered by Dr. Didriksen revealed that Plaintiff has an exceptional IQ—her scores placed her in the 99th or 98th percentile for general intelligence. Most of the other tests Dr. Didriksen employed to gauge more particular components of cognitive function reflected above average performance consistent with Plaintiff's high IQ. However, Dr. Didriksen noted in her report that Plaintiff's

---

[7] AR 233.
[8] AR 233.
[9] AR 232.

"Spelling and Math Computation scores fall in an average range and appear somewhat inconsistent with intellectual ability and prior educational and occupational achievements."[10] Similarly, Dr. Didriksen reported that "scores on some measures of memory appear inconsistent with IQ scores and suggest a decrement in memory functioning."[11] For example, "[h]er ability to recall associated word pairs and attend to novel visual stimuli is at the lowest limit of the average range (25th percentile)."[12] Dr. Didriksen noted that the "results: are considered a valid indication of her current level of neurocognitive and personality/behavioral functioning under environmentally-safe conditions with rest periods provided, as necessary to elicit her best performance."[13] While Dr. Didriksen usually performs her evaluation within a single day, it was necessary to spread Plaintiff's evaluation over three days. "It is highly unlikely that [Plaintiff] is able to function effectively and inefficiently [sic] on a consistent basis at the present time as she experienced severe fatigue after two consecutive days of assessment which were not even the equivalent of normal workdays," wrote Dr. Didriksen.[14]

Dr. Didriksen diagnosed Plaintiff with an "Unspecified Neurocognitive Disorder" and "Adjustment Disorder With Mixed Anxiety and Depressed Mood." She noted that Plaintiff suffers from "compromised physical health (chronic fatigue and pain, sleep disturbances, and unpredictable reactions to environmental incitants)."[15]

---

[10] AR 245-46.
[11] AR 247-48.
[12] AR 247-48.
[13] AR 248.
[14] AR 248
[15] AR 248.

This reference to "incitants" appears to refer to Plaintiff's statement that "smells became intolerable" to her. For example, while staying in a hotel in Tampa—she was there to seek treatment for gastroenterological issues—she was overwhelmed by odors of mold and chlorine and was unable to travel without a charcoal mask on. She had a similar reaction on a work trip to San Francisco, which she cut short because smells resulted in a severe headache. Dr. Didriksen concluded her report noting that Plaintiff is "totally disabled, now, and in the foreseeable future."[16] Among other things, she recommended Plaintiff continue to avoid toxic/neurotoxic substances and to continue participation in Dr. Rea's treatment regimen.

Dr. David Jarry, a board-certified internist reviewed Plaintiff's file on behalf of Unum. Dr. Jarry reviewed Dr. Rea's file and noted that despite over 27 encounters between Plaintiff and Dr. Rea, documentation of the doctor's examinations was scant and consisted of a report of Plaintiff's symptoms and his prescribed treatment regime.[17] Dr. Jarry also reviewed Dr. Didriksen's evaluation and the medical records obtained from several other health specialists who had treated Plaintiff, including: Dr. Overberg, Plaintiff's dietician; Dr. Johnson, an internist who treated Plaintiff's gastronomical distress after a trip to Mexico in 2008; and Dr. Cole, a therapist who met with Plaintiff 2-3 times a week.[18] Amongst these records were lab results presented with minimal explanation and interpretation by the treating providers. Dr. Jarry found that most of the testing performed by Dr. Rea to diagnose Plaintiff was

---

[16] AR 249.
[17] AR 749.
[18] AR 749-50.

outside of generally accepted medical practice and included testing from specialized labs that were not FDA approved. Because Dr. Jarry, the primary Unum physician on Plaintiff's account, disagreed with the conclusions drawn by Dr. Rea, Plaintiff's file was referred to a second Unum physician, Dr. James Bress.

Dr. Bress, a board-certified physician in Internal Medicine, also disagreed with Dr. Rea's diagnosis of physical illness caused by toxic exposure. Dr. Bress could not find any clear evidence that Plaintiff's symptoms were caused by toxic mold exposure or chemical sensitivity. Furthermore, Dr. Bress noted Plaintiff's extensive history of psychological illnesses, particularly her long history of depression, had not been addressed by her physicians as a possible cause of her symptoms.[19]

Dr. Thomas McLaren, a board-certified neuropsychologist, reviewed Dr. Didriksen's neuropsychological evaluation of Plaintiff. Specifically, Dr. McLaren was charged with reviewing Dr. Didriksen's conclusion that Plaintiff was impaired due to the physical effects of toxic exposure. In his review, Dr. McLaren noted Plaintiff's high performance on a number of neuropsychological tests. Despite Plaintiff's high performance, Dr. Didriksen still diagnosed her with impairment due to the physical effect of toxic exposure. This diagnosis was based in large part on the significant weight Dr. Dr. Didriksen gave to Plaintiff self-reporting cognitive impairment in the work environment.[20] McLaren further observed that Plaintiff's claims of cognitive impairment were inconsistent with certain actions taken by Plaintiff, such as being able to drive 80 miles safely. Ultimately, Dr. McLaren disagreed with Dr. Didriksen's

---

[19] AR 962-64.
[20] AR 969-71.

6

conclusion that Plaintiff would be cognitively impaired when exposed to environmental toxins. Rather, based on a review of her records, Dr. McLaren stated his opinion that Plaintiff suffered from psychiatric impairment stemming from anxiety and depression.[21] Because Dr. McLaren did not agree with Dr. Didriksen's diagnosis, Plaintiff's file was referred to a second board-certified Unum neuropsychologist, Dr. William Black.

After review of Plaintiff's file, with a focus on Plaintiff's high performance on cognitive tests as well as her history of marriage and family counseling, Dr. Black concluded that her cognitive performance was highly irregular for a patient with central nervous system issues. On the contrary, Dr. Black believed that Plaintiff's file reflected a patient with high levels of depression, anxiety, and hypochondria. Furthermore, Dr. Black noted inconsistencies in Dr. Rea's treatment of Plaintiff. Namely, Dr. Rea insisted he was unaware of any of Plaintiff's potential psychological issues yet referred Plaintiff to counseling. Dr. Black finally concluded that Plaintiff's file evinced a patient suffering from physical symptoms manifesting themselves as a result of depression, anxiety, and hypochondria, as opposed to a patient suffering cognitive decline caused by exposure to toxic substances.[22]

Defendant issued the Plan to Ubisoft, effective January 1, 2011, to provide Ubisoft's employees with short and long-term disability coverage. The Plan defines "Totally Disabled" as follows:

### WHEN ARE YOU TOTALLY DISABLED?

---

[21] AR 972-75.
[22] AR 976-80.

For the first 27 months, you are totally disabled when, as a result of sickness or injury, you are unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way.

After benefits have been paid for 24 months of disability you are totally disabled when, as a result of sickness or injury, you are not able to engage with reasonable continuity in any occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, and physical and mental capacity.[23]

Critically, after two years the Plan cuts off benefits for beneficiaries who are not disabled at least in part due to some physical limitation:

### *WHAT IS THE LIMITED BENEFIT PERIOD FOR MENTAL DISORDERS?*

**MENTAL DISORDER** means a psychiatric or psychological condition classified in the Diagnostic and Statistical Manual of Mental

---

[23] AR 286.

Health Disorders (DSM) published by the American Psychiatric Association, most current as of the start of a disability. Such disorders include, but are not limited to, psychotic, emotional or behavioral disorders. . . .

Disabilities due solely to mental disorders are limited to a maximum pay period of 24 months. . . .

Unum will not apply the **mental disorder** limitation to dementia if it is a result of:

- stroke;

- trauma;

- viral infection;

- Alzheimer's disease; or

- Other conditions not listed which are not usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs or other similar methods of treatment.[24]

---

[24] AR 293.

On August 27, 2014, Unum approved Plaintiff's request for LTD benefits, but only for psychiatric impairment. Thus, Plaintiff was only entitled to a maximum benefit period of 24 months and her benefits would expire on June 30, 2016. Realizing the implication of this determination, Dr. Didriksen contacted Unum and urged them to reconsider, arguing that environmentally susceptible patients had for years been misdiagnosed as psychologically impaired by doctors who did not specialize in the area of chemical/environmental sensitivity.[25] Dr. Didriksen's plea did not sway Drs. Black and McLaren.[26]

Over the next two years Plaintiff continued to receive treatment for her disability. Her primary treatment was psychotherapy with Dr. Carol Cole and occasional sessions with Dr. Rea. Plaintiff's condition worsened to the point that the only places to which she felt comfortable going were the meditation center and offices of Drs. Rea and Cole. Unum received periodic updates from Dr. Cole as to Plaintiff's status and treatment but remained steadfast in its conclusion that Plaintiff was suffering from a psychological condition.

In June 2016, as Plaintiff's benefits were set to expire, Plaintiff reached out to Unum with additional documentation supporting her claim of a physiological, as opposed to psychological, disability. Plaintiff's primary evidence was an Attending Physician's Statement completed by Dr. Rea on June 22, 2016, in which he diagnosed Plaintiff with Toxic Encephalopathy and

---

[25] AR 1022.
[26] AR 1023-31.

Autonomic Nervous System Dysfunction and Chemical Sensitivity.[27] Dr. Rea supported his diagnosis by highlighting Plaintiff's failure on a Romberg test as well as the results of a Triple Camera SPECT Brain Scan.[28]

Plaintiff also provided a letter from Dr. Cole, her treating psychotherapist, opining that Plaintiff's primary malady was some form of neurotoxicity. Although Dr. Cole admitted Plaintiff also suffered from anxiety and depression, in her opinion those psychological issues stemmed from the difficulties Plaintiff encountered as a result of her neurotoxicity.[29]

Much like the initial back and forth in 2014, Unum then charged physicians Todd Lyon and James Bress with reviewing the diagnoses and supporting evidence provided by Plaintiff's physicians. Dr. Lyon, a board-certified family medicine physician, analyzed Dr. Rea's and Dr. Cole's notes. Dr. Lyon's primary takeaway was the lack of physical findings supporting toxic exposure. Although Dr. Rea cited several physical tests in support of his conclusions, notably a SPECT brain exam and a urine test, Dr. Lyons stated those tests were not typically utilized for diagnostic purposes in the standard practice of medicine and have not been verified to be of clinical use.[30] In addition to dismissing the laboratory tests utilized by Dr. Rea, Dr. Lyon noted that Plaintiff did not exhibit muscular atrophy, neurologic abnormalities, or loss of motion, all of which would tend to point towards a physiological cause

---

[27] AR 1360-70.
[28] Id.
[29] AR 1371-72.
[30] AR 1519-25.

of Plaintiff's symptoms.[31] In sum, Dr. Lyon reaffirmed the stance taken by Unum throughout the course of proceedings, which was that Plaintiff had not provided sufficient physical evidence to justify a finding of physiological impairment.

Dr. Bress reached essentially the same conclusions as Dr. Lyon. In particular, Dr. Bress noted that the SPECT brain exam is not a recognized test for diagnosing organically caused brain damage. Moreover, Dr. Bress once again pointed to the undisputed reoccurrence of depression and anxiety related episodes throughout Plaintiff's illness.[32]

On September 2, 2016, Unum informed Plaintiff it was denying her benefits claim. On March 1, 2017, Plaintiff advised Unum of her decision to appeal its denial of benefits. The appeal cited Plaintiff's disagreement with Unum's decision to discount her positive SPECT and Romberg tests. The appeal further urged Unum to reconsider its decision in light of the Social Security Administration's ("SSA") decision to grant Plaintiff benefits after determining she suffered from toxic encephalopathy and chemical sensitivity that contributed to her inability to work.[33] During the appellate process, Unum and Plaintiff bickered over whether Plaintiff was required to submit to an Independent Medical Examination ("IME").[34] Plaintiff asserted she was not required to attend the IME, scheduled for June 2, 2017, because it was outside

---

[31] AR 1494-95.
[32] AR 1533-38.
[33] AR 1680-1718.
[34] AR 3239-40.

of the 90-day window Unum had to decide the appeal and Unum was refusing to pay her benefits during the pendency of the appeal.[35] Unum's position, on the other hand, was that June 2, 2017 was within the appeal timeframe and it had no obligation to pay benefits during the appeal.[36]

Dr. Scott Norris, Unum's reviewing physician for the appeal, analyzed Plaintiff's file and came to largely the same conclusions as the previous Unum reviewing physicians. Namely, the physical evidence used by Dr. Rea to reach his diagnosis consisted of unreliable testing methods, and Dr. Rea ignored or failed to follow up on several tests indicating Plaintiff did not suffer from toxic encephalopathy. For example, Plaintiff had a normal MRI, a normal EEG, no evidence of any structural neurological damage, and Dr. Rea failed to refer Plaintiff for a multidisciplinary neurological evaluation.[37]

On June 9, 2017 Unum denied Plaintiff's appeal. In its letter detailing its denial, Unum cited Dr. Norris' review of Plaintiff's file, Plaintiff's failure to attend the IME, skepticism regarding Dr. Rea's credibility, and the different standards of the SSA as its rationale for the decision.[38] On July 21, 2017 Plaintiff provided Unum with a letter from Dr. Rea defending his treatments and diagnostic methods.[39] On August 7, 2017, Unum informed Plaintiff it would not alter its earlier decision denying her benefits. On August 14, 2017, Plaintiff instituted her present suit.

---

[35] AR 3245
[36] AR 3285
[37] AR 3300-12.
[38] AR 3318-28.
[39] AR 3446-50.

## LEGAL STANDARD

When reviewing a denial of benefits made by an ERISA plan administrator, the Court applies a *de novo* standard of review "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). A court reviewing a plan administrator's decision de novo must "independently weigh the facts and opinions in the administrative record to determine whether the claimant has met his burden of showing that he is disabled within the meaning of the policy." *Pike v. Hartford Life & Accident Ins. Co.*, 368 F. Supp. 3d 1018, 1030 (E.D. Tex. 2019). Even under a *de novo* standard, however, it is the claimant that bears the burden of proving she is entitled to the benefits. *See id.* at 1031. "Once the record is finalized, a district court must remain within its bounds in conducting a review of the administrator's findings, even in the face of disputed facts." *Ariana M. v. Humana Health Plan of Texas Incorporated*, 884 F.3d 246, 256 (5th. Cir. 2018) (citation omitted).[40]

Here, it is undisputed the Plan lacked discretionary language, and thus the Court's standard of review is *de novo*. To appropriately frame the parties' dispute in the context of the standard of review, Plaintiff must prove by a preponderance of the evidence, utilizing only the information in the

---

[40] There are rare exceptions to this rule, none of which are argued by either party here.

administrative record, that her infirmity is caused by exposure to toxic mold as opposed to mental illness.

## **DISCUSSION**

Despite the extensive administrative record and detailed scientific and medical evidence, the crux of the present dispute is straightforward. Plaintiff alleges that her disability is caused by physiological illness brought on by toxic mold exposure. Unum asserts that Plaintiff's disability is instead of a psychological origin, specifically anxiety and depression. In short, Unum was within its rights under the Plan to terminate Plaintiff's benefits unless Plaintiff can prove by a preponderance of the evidence that her illness was caused by a physiological disease.

Both parties have provided copious medical and scientific evidence supporting their respective positions, often directly contradicting each other. Plaintiff relies on six primary pieces of evidence to carry her burden: 1) the expert opinion of her treating physician, Dr. Rea; 2) the expert opinion of her treating psychologists, Dr. Nancy Didriksen and Dr. Carol Cole; 3) her SPECT results showing evidence of neurotoxicity; 4) a urine test showing the presence of mycotoxins in Plaintiff's body; 5) the presence of stachybotrys chartarum, a type of bacteria linked to black mold, in her home; and 6) the affirmative decision of the administrative law judge ("ALJ") in her claim for social security benefits. For the following reasons, the Court finds that Plaintiff has failed to carry her burden of proving her illness is of a physiological nature.

## I.    The Expert Opinion of Dr. William Rea

The primary basis of Plaintiff's case rests on Dr. Rea's diagnosis that Plaintiff has toxic encephalopathy. The alleged disease occasionally goes by other names as well, but essentially the diagnosis means that as a result of exposure to toxic chemicals, in Plaintiff's case black mold, the patient suffers severe physical symptoms when exposed to common chemicals. *Coffin v. Orkin Exterminating Co.,* 20 Fed. Supp. 2d 107 (D. Ct. Maine 07/21/1998).

Although Plaintiff provides additional evidence to support the presence of mycotoxins in her system, Dr. Rea's diagnosis is the only diagnosis by a physician assigning responsibility for Plaintiff's symptoms to a physical source. Plaintiff's sole reliance on Dr. Rea's toxic encephalopathy diagnosis creates a two-fold dilemma. First, the very notion of toxic encephalopathy as a valid diagnosis is one that is debated in the medical community. *See Minner v. American*, Mortgage & Guaranty Co., 791 A. 2d 826 (Sup. Ct. Del. 04/17/2000); *see also Alder v. Bayer Corp.,* 61 P. 3d 1068, 1081 (Utah 2002). Furthermore, courts considering the validity of a toxic encephalopathy diagnosis, often within the context of *Daubert* motions, routinely deny attempts to introduce evidence of said diagnosis. *See Bradley v. Brown*, 42 F. 3d 434, 438 (7th Cir. 1994) (Toxic encephalopathy's etiology has not progressed from the plausible or hypothetical to knowledge capable of assisting the trier of fact); *Kuxhausen v. Tillman Partners, L.P.,* 197 P. 3d 859 (Ct. App. Kansas 12/12/2008) ("Courts have generally held testimony about the diagnosis of multiple-chemical

sensitivity inadmissible . . .because the diagnosis is not generally accepted in the relevant medical community.").[41] In fact, one court has gone as far to remark that "every federal court that has addressed the issue of the admissibility of expert testimony on MCS under *Daubert* has found such testimony too speculative to meet the requirement of scientific knowledge." *Snyman v. W. Baum Co., Inc.*, 2008 WL 5337075 at *1 (S.D. NY. Dec. 22, 2008). (citations and quotations omitted).

Although none of the above-referenced cases are relatively recent, Plaintiff has failed to submit any case law or convincing scientific evidence compelling a different conclusion. Plaintiff's primary relied upon case, *Parker v. Vulcan Materials Co. LTD Plan*, is distinguishable because although the plaintiff in that case was diagnosed with toxic encephalopathy by one physician, other physicians diagnosed the plaintiff with certifiable physical ailments such as Lyme Disease, TMJ, and ankle problems. 2011 WL 7745478 (C.D. Cal. 12/20/2011). Here Plaintiff's sole diagnosis of physical illness by a physician is Dr. Rea's toxic encephalopathy diagnosis.

This brings the Court to the second problem regarding Plaintiff's reliance on Dr. Rea's diagnosis. Not only is toxic encephalopathy often considered "a controversial diagnosis unsupported by sound scientific reasoning or methodology," but many courts "have specifically rejected or discredited the opinions of Rea and Didriksen on this subject." *McNeel v. Union*

---

[41] Multiple-Chemical Sensitivity, or MCS, is another alleged condition resulting from neurological damage caused by toxic mold exposure. For purposes of this opinion MCS and toxic encephalopathy will be considered interchangeable.

*Pacific Railroad Co.*, 753 N.W. 2d 321, 331 (Neb. 2008) (citing *Myhre v. Workers Compensation Bureau,* 653 N.W.2d 705 (N.D.2002); *Jones v. Ruskin Mfg.,* 834 So.2d 1126 (La.App.2002). Dr. Rea, specifically, has had his credibility on this issue called into question by courts and defense experts across the country. *See Ramon v. Astrue*, No. 09cv2400-BEN, 2010 WL 5829547, at *7 (S.D. Cal. Dec. 30, 2010) ("[The Court] gives little weight to the opinions of Dr. Rea. If he sounds like a charlatan, the Texas Medical Board thinks so too."); *see also Trader v. Colvin*, No. 2:12-cv-00924, 2013 WL 8750424, at *7 (D. Utah Aug. 22, 2013) ("The record contains evidence that Dr. Rea performed inaccurate testing and used unsupported methods of testing.").

The Court recognizes that Dr. Rea resolved his issues with the Texas Medical Board in 2014, before he began treating Plaintiff. Additionally, rejection of Dr. Rea and his credentials is not universal. Several courts have allowed Dr. Rea's testimony to survive a *Daubert* challenge. *See Kennedy v. Eden Advanced Pest Techs.,* 222 Or. App. 431, 452, 193 P.3d 1030, 1042 (2008); *Rodrigue v. Lafourche Par. Sch. Bd.*, 909 So. 2d 627, 6352004-1136 (La. App. 1 Cir. 2005).

Moreover, the Court understands that suspicions, and indeed evidence, of biased physicians exist on both sides in this case. *See Saffon v. Wells Fargo & Co. Long Term Disab. Plan*, 511 F.3d 1206, 1210 (9th Cir. 2008) ("Unum-Provident Corp. . . . boosted its profits by repeatedly denying benefits claims it knew to be valid. Unum-Provident's internal memos revealed that the

company's senior officers relied on ERISA's deferential standard of review to avoid detection and liability") (citing John H. Langbein, <u>Trust Law as Regulatory Law: The UNUM/Provident Scandal and Judicial Review of Benefit Denials Under ERISA</u>, 101 N.W. U. L. Rev. 1315, 1317-21 (2007). Furthermore, much like Dr. Rea has dedicated his professional career to the advocacy of environmental disease diagnoses, physicians like Dr. Black have made the attempted debunking of said diagnoses their calling. *See See, e.g.,* Greve KW, Springer S, Bianchini KJ, Black FW, Heinly MT, Love JM, Swift DA, Ciota MA. *Malingering in toxic exposure: classification accuracy of reliable digit span and WAIS-II/ DigitSpan scaled.scores.* Assessment. 2007 Mar. l4(1):12-21.

By raising doubts as to Dr. Rea's credibility, the Court is not "completely disregarding Dr. Rea's opinion," as Plaintiff alleges UNUM is doing. (Rec. Doc. 23 at 1). Nevertheless, the fact remains that Plaintiff is relying primarily on the expert medical opinion of Dr. Rea to carry her case, and there are significant questions as to the credibility of his opinion and validity of his testing methods. Ultimately, it is Plaintiff who bears the burden of proving she is entitled to the benefits. *Pike,* 368 F. Supp. 3d 1018 at 1031 (E.D. Tex. 2019). Considering the blanket rejection of Dr. Rea's conclusions by Unum's reviewing physicians, by asserting that she has met her burden it is in fact Plaintiff who asks the Court to completely disregard the opinions of UNUM's reviewing physicians.

## II.    THE EXPERT OPINIONS OF DR. NANCY DIDRIKSEN AND DR. CAROL COLE

As discussed in the Court's recitation of the facts, both Dr. Cole and Dr. Didriksen diagnosed Plaintiff with an unspecified neurocognitive disorder. Unum argues that Dr. Cole's and Dr. Didriksen's expert opinions cannot be utilized to assert Plaintiff suffers from neurotoxicity. Plaintiff counters by stating Dr. Cole and Dr. Didriksen's long history of treating patients with neurotoxicity renders them capable of providing an opinion on the cause of Plaintiff's illness. The Court finds that Unum's position is correct.

As psychologists, Dr. Cole and Dr. Didriksen are not qualified to render an opinion as to possible physical causes of Plaintiff's psychological ailments. *See Buxton v. Halter,* 246 F. 3d 762, 775 (6th Cir. 2001); *Wildman v. Astrue*, 596 F. 3d 959 (8th Cir. 2010); *Dee vs. PCS Property Management, Inc.,* 174 Cal. App. 4th 390 (Ct. App. Ca. 05/11/2009) (holding that a psychologist could not attribute observations about the plaintiff's emotions and relationships to "medical or organic causes. He may not label them brain damage or brain injury. That is a medical decision.").[42]

This is not to say that there is no value in the testimony and expertise of Dr. Didriksen and Dr. Cole. As Plaintiff correctly posits, their testimony is helpful in tracking the progress and severity of Plaintiff's symptoms. Unfortunately for Plaintiff, their testimony is of no use in discovering the

---

[42] To the extent Unum's reviewing physicians are neuropsychologists, notably Dr. Black and Dr. McLaren, the same restrictions apply to their opinions.

source of those symptoms inasmuch as the source is of a physical, and not psychological, nature.

### III.   PLAINTIFF'S PHYSICAL TEST RESULTS

Plaintiff relies primarily on three physical test results to prove her MCS or toxic encephalopathy diagnosis: 1) the presence of stachybotrys chartarum, a type of bacteria linked to black mold, in her home, 2) a urine test showing the presence of mycotoxins in Plaintiff's body, 3) and her SPECT results showing evidence of neurotoxicity. Plaintiff argues that a combination of these three tests is sufficient to prove her exposure to toxic mold actually caused the symptoms she is experiencing.

Turning first to the presence of stachybotrys chartarum in Plaintiff's home, the Court notes that by itself this is almost meaningless. Although stachybotrys chartarum is a toxigenic mold, that merely means it is possible for the mold to produce mycotoxins. *Dee vs. PCS Property Management, Inc.*, 174 Cal. App. 4th 390, 392-393 (Ct. App. 2nd Ca.), citing Comment, *Mold is Gold: But, Will It Be the Next Asbestos?* (2003) 30 Pepperdine L. Rev. 529, 532. Mycotoxins are the organic compounds that actually trigger a toxic response in people. *Id.* Thus, while the presence of stachybotrys chartarum in Plaintiff's home is important to establish a baseline possibility of exposure to mycotoxins, it is the urine test would demonstrate Plaintiff's actual exposure to mycotoxins.

There is no dispute that the result of Real Time Labs urine test (the "Test") revealed that Plaintiff had been exposed to mycotoxins. Rather, the

dispute is over the validity of the Test. The Test was validated by the CLIA and the CPA, but not the FDA.[43] Plaintiff has also provided evidence that certain sectors of the medical community recognize the Test as an acceptable method of diagnosing the presence of mycotoxins.[44] Unum's physicians, on the other hand, universally say that as the Test was not FDA approved or clinically validated, it does not represent standard medical practice. Lack of FDA approval for certain toxigenic mold tests has been seen by other courts as a reason to disregard the test. *See Geffcken v. D'Andrea*, 137 Cal. App. 4th 1298, 1310 (Ct. App. Cal. 03/28/2006) (disregarding a positive IBT blood serology test showing the presence of mycotoxins in the plaintiff in part because it was not FDA approved). The unanimity of the Unum physicians in criticizing the Test is also telling. *See Correia v. Unum Life Insurance Company of America*, 14 Civ. 7690 (KPF), 2016 WL 5462827 at *32. (S.D. NY Sept. 29, 2016) ("With respect to Unum's criticism of Dr. Moyer's testing, the Court notes that multiple Unum reviewers suggested her methodology was dated or ineffective.").

Finally, Plaintiff urges the Court to accept her SPECT results as the "golden standard" for diagnosing neurotoxicity, as MRI's are unable to do so.[45] SPECT results by themselves may not satisfy causation. *See Smith v. Bisso Marine, LLC*, No. 6:14-cv-00697, 2017 WL 6887122, at *1 (W.D. La. 2017).

---

[43] AR 3367-69.
[44] AR 3383-93.
[45] AR 3362, 1916, 3416, 3510.

They may, however, be used to give weight to other evidence and findings. *See Stewart v. Hankins,* No. 4:15-cv-586, 2016 WL 7971939, at *2 (E.D. Tex. Oct. 7, 2016). Therefore, if reliable, Plaintiff's SPECT results may be used to reinforce the results of her urine test and give weight to her claim of mycotoxin exposure.

Regrettably, like every other contested issue in this case, there is little consensus over the reliability of SPECT exams when it comes to diagnosing toxic encephalopathy. Although Plaintiff has provided some evidence that the use of SPECT exams to diagnose toxic encephalopathy is accepted, the opinion of Unum physicians and a review of case law shows that is far from the norm. *See Snow v. Astrue*, 2011 WL 400744 (D. Ct. Ore. 09/09/2011) (denying benefits after testimony that SPECT scans were unproven as diagnostic tools for toxicological diseases); *Dee v. PCS Property Management, Inc.*, 74 Cal. App. 4th 390-394 (Ct. App. 05/11/2009) (excluding expert testimony on the results of a SPECT scan supporting diagnosis of a toxicological disease because it was not generally accepted in the scientific community). In fact, Dr. Rea himself has been criticized by a federal court when attempting to utilize a SPECT scan to support a toxic encephalopathy diagnosis. *See Falksen v. Secretary of Dept. of Health and Human Services*, 2004 WL 785056 at *11 (U.S. Ct. of Fed. Claims 03/30/2004) (Rejecting Dr. Rea's use of a SPECT scan because the "American Academy of Neurology does not accept brain SPECT scans "for use in

diagnosing encephalopathy or encephalitis except for AIDS.") (quotation omitted).

Finally, despite Plaintiff's attempts to cite slight factual distinctions between the above-cited cases and her own, the fact remains that Plaintiff has failed to cite a single case where the tests relied on by Dr. Rea have been accepted as valid. Plaintiff seems to implicitly realize this, as she offers a final half-hearted argument by rhetorically asking which tests, if not these, are clinically valid to prove toxic encephalopathy. The Court understands Plaintiff's frustration, but the lack of reliable testing to prove toxic encephalopathy cannot remove doubts about the validity of the tests utilized by Dr. Rea.

To sum, considering the Unum physician's unanimous critiques of Dr. Rea's testing methods and the position of other courts regarding the same or similar methods, the Court has significant doubt about Plaintiff's exposure to mycotoxins.

## IV.    AFFIRMATIVE EVIDENCE OF DEPRESSION AND ANXIETY

Thus far the Court has primarily focused on the flaws in Plaintiff's proffered evidence supporting her claim. There also exists affirmative proof in the administrative record that her symptoms are psychological and not physiological. First and foremost is Plaintiff's long history of anxiety,

depression, and panic attacks.[46] These psychological issues were not only noted by Unum physicians, but were diagnosed by Dr. Didriksen and Dr. Cole as well. The record reflects that Plaintiff may have suffered from psychological concerns predating her alleged exposure to the toxic mold, as evidenced by her history of family and marriage counseling.[47] Thus, this is not a case where toxic exposure may be exposed as the culprit by the process of elimination. There is a viable alternative diagnosis, that physicians on both sides agree Plaintiff suffers from, that can explain her disability.

Secondly, standard laboratory testing did not return any evidence of environmental toxicity, metabolic/hematologic disorders or autoimmune disease. Plaintiff's EEG and MRI results were normal.[48] *See Falksen*, 2004 WL 785056 at *10 (viewing a normal EEG scan as affirmative of proof of the lack of encephalopathy).

## V.   THE IME AND PLAINTIFF'S AFFIRMATIVE SSA DECISION

Finally, as an ancillary matter, the Court finds that it need not decide which party was in the right regarding Plaintiff's duty to attend the scheduled IME. Such a determination would be relevant if this matter was being adjudged under an abuse of discretion standard, but it is not relevant under a *de novo* review. Accordingly, the Court's only job is to analyze the record and determine whether Plaintiff has met her burden of showing that she is disabled

---

[46] AR 3300-12.
[47] AR 976-980.
[48] AR 3300-12.

within the meaning of the policy. *Pike*, 368 F. Supp. 3d 1018, at 1030. Plaintiff's failure to attend, or rightful refusal to attend, the IME has no bearing on that determination.

Turning next to Plaintiff's affirmative SSA decision, it does not alter the Court's finding that Plaintiff has failed to meet her burden. The issue of Dr. Rea's credibility was never raised in Plaintiff's Social Security adjudication, and therefore this Court was able to take that into account when the ALJ could not. Additionally, the Court stands in the place of the plan administrator when determining an appeal of a plan administrator's denial of benefits. *Richards v. Hewlett-Packard Corp.*, 592 F. 3d 232 (1st Cir. 2010). Therefore, the ultimate decision of the ALJ, received at the very end of a claims process, should not be a major factor in the Court's decision. *See Estate of Bratton v. National Union Fire Ins. Co.,* 215 F.3d 516, 521 (5th Cir. 2000) (Explaining that facts considered in the administrative record must have been made available to the administrator in a manner that gives the administrator "a fair opportunity to consider it.").

## **CONCLUSION**

This Court is aware that Plaintiff suffers from a debilitating illness of some kind that continues to negatively impact her life. However, the Court finds that the crux of Petitioner's argument lacks sufficient evidence by a preponderance to prove that she suffered toxic encephalitis, or any other neurological disorder, or that

exposure to toxigenic mold can or did cause her injury. Regretfully, relief must be denied for the foregoing reasons.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's *Motion for Judgment as Matter of Law* **(Rec. Doc. 19) is DENIED.**

**IT IS FURTHER ORDERED** that *Unum's Motion for Judgment as Matter of Law* **(Rec. Doc. 21) is GRANTED**.

New Orleans, Louisiana this 29th day of May, 2020.


CARL J. BARBIER
UNITED STATES DISTRICT JUDGE